**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| MAXX VEGA, Derivatively on Behalf of ONTRAK, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TERREN S. PEIZER, BRANDON H. LAVERNE, CURTIS MEDEIROS, RICHARD A. BERMAN, GUSTAVO GIRALDO, DIANE SELOFF, MICHAEL SHERMAN, KATHERINE B. QUINN, ROBERT REBAK, and EDWARD ZECCHINI, | ) Case No. ) ) ) ) ) ) ) |
| Individual Defendants, | ) ) |
| -and- | ) ) |
| ONTRAK, INC., a Delaware corporation, | ) ) |
| Nominal Defendant. | ) ) ) |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Maxx Vega ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Ontrak, Inc. ("Ontrak" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Ontrak's reputation, goodwill, and standing in the business community and has exposed Ontrak to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Ontrak in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Ontrak's directors and officers from August 5, 2020 through the present (the "Relevant Period").

3.      Ontrak is a Delaware healthcare company that offers a "Predict-Recommend-Engage" platform by organizing and automating healthcare data integration and analytics for its members. An essential part of this platform is "Ontrak solutions," designed to provide healthcare solutions to members with behavioral issues that result in chronic medical conditions.

4.      The Company advertised that its programs could reduce high healthcare costs for Ontrak members by using predictive analytics and human engagement to provide treatment for healthcare plan members suffering from behavioral problems.

5.      In November 2020, the Company revealed that its largest customer, Aetna Inc. ("Aetna"), was conducting a compliance review of Ontrak "despite the customer having no compliance issues or concerns with Ontrak." The Company also stated that it expected "significant expansion" with Aetna.

6.      However, this could not have been further from the truth. Rather, Aetna requested that the Company complete a corrective action plan ("CAP") and submit information

2

demonstrating "meaningful measures" of the benefits from Ontrak's programs. The Company did not submit a plan by the end of the 2020 fiscal year, in time for Aetna to renew its contract with Ontrak. As a result, by February 2021, Ontrak's CEO informed employees that Aetna would not be renewing its contract with the Company.

7.      On December 21, 2020, while the truth remained undisclosed, Ontrak completed an offering of preferred stock, raising gross proceeds of approximately $42.8 million for the Company.

8.      It was not until months later, on March 1, 2021, that Ontrak announced in a press release that Aetna had terminated its contract with the Company. The release stated that, since Aetna "evaluated Ontrak on a provider basis," the Company's performance was evaluated "based on [its] ability to achieve the lowest possible cost per medical visit, and not on [its] clinical outcomes data or medical cost savings." Consequently, Ontrak reduced its revenue guidance for the 2021 fiscal year.

9.      On this news, the Company's share price fell by approximately 46%, or $27.32, closing at $31.62 per share on March 1, 2021.

10.     The Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (1) the Company was being evaluated on how it executed on a CAP sent by Aetna, though the Company had no plans to meaningfully address this CAP; (2) due to this evaluation, Aetna was not likely to find Ontrak to be effective and was therefore likely to not renew its contract with Ontrak; (3) the loss of Aetna would significantly harm the Company; (4) therefore, Ontrak could not achieve its projected revenue guidance for the 2021 fiscal year; and (5) the Company failed to maintain adequate

internal controls. As a result of the foregoing, Ontrak's public statements were materially false and misleading at all relevant times.

11.    The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

12.    As detailed herein, and as alleged in the ongoing federal securities class action in the Central District of California styled *Farhar v. Ontrak, Inc., et al.*, Case No. 2:21-cv-01987 (the "Federal Securities Class Action"), Ontrak's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

15.    Venue is proper in this District because Ontrak is incorporated in this District and the Defendants have conducted business in this District. Further, Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

16.    Plaintiff Maxx Vega is and has continuously been a stockholder of Ontrak during the wrongdoing complained of herein.

### Nominal Defendant

4

17.    Defendant Ontrak is a Delaware corporation with its principal executive offices at 2120 Colorado Ave., Suite 230, Santa Monica, CA 90404. Ontrak's shares trade on the NASDAQ under the ticker symbol "OTRK."

**Individual Defendants**

18.    Defendant Terren S. Peizer ("Peizer") is the founder of Ontrak and served as the Company's CEO and Chairman of the Board Directors since 2003. Effective April 12, 2021, Peizer was appointed to serve as the Executive Chairman and continues to serve as Chairman of the Board but is no longer CEO. For the fiscal year ended December 31, 2020, Peizer received $467,786 in total compensation from the Company.

19.    Defendant Brandon H. LaVerne ("LaVerne") has served as the Company's CFO since March 2020. For the fiscal year ended December 31, 2020, LaVerne received $1,696,818 in total compensation from the Company.

20.    Defendant Curtis Medeiros ("Medeiros") served as the Company's President and Chief Operating Officer ("COO") from December 2019 until he resigned on June 4, 2021.

21.    Defendant Richard A. Berman ("Berman") has served as a Company director since 2014. He is Chairman of the Audit Committee and a member of the Nominations and Governance Committee.

22.    Defendant Gustavo Giraldo ("Giraldo") served as a Company director since November 2019. He is a member of the Audit Committee and the Compensation Committee.

23.    Defendant Robert Rebak ("Rebak") has served as a Company director since July 2019. He is a member of the Nominations and Governance Committee.

24.    Defendant Diane Seloff ("Seloff") has served as a Company director since October 2018. She is a member of the Audit Committee.

25.    Defendant Michael Sherman ("Sherman") has served as a Company director since

July 2017. He is Chairman of the Compensation Committee and Chairman of the Nominations and Governance Committee.

26.    Defendant Katherine B. Quinn ("Quinn") has served as a Company director since August 10, 2020. She is a member of the Nominations and Governance Committee.

27.    Defendant Edward Zecchini ("Zecchini") has served as a Company director since October 2018. He is a member of the Compensation Committee.

28.    Collectively, Defendants Berman, Giraldo, and Seloff are referred to herein as the "Audit Committee Defendants."

29.    Collectively, Individual Defendants Peizer, LaVerne, Medeiros, Berman, Giraldo, Rebak, Seloff, Sherman, Quinn, and Zecchini are referred to herein as the "Individual Defendants."

30.    The Individual Defendants, because of their positions with Ontrak, possessed the power and authority to control the contents of Ontrak's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

## Background

31.    Ontrak is a Delaware healthcare company that offers a "Predict-Recommend-

6

Engage" platform, which organizes and automates healthcare data integration and analytics for its members. An essential part of this platform is "Ontrak solutions," designed to provide healthcare solutions to members with behavioral issues that result in chronic medical conditions. The Company advertised itself as a technology-enabled healthcare company that could reduce high healthcare costs for its members by combining predictive analytics with human engagement to treat healthcare plan members suffering from behavioral problems.

32.    Throughout the Relevant Period, Aetna was Ontrak's largest customer. Indeed, on November 5, 2020, the Company disclosed in a Form 10-Q that Aetna accounted for the majority of the Company's revenue for the three months ended September 30, 2020 and almost half of the Company's revenue for the nine months ended September 30, 2020, as shown below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Percentage of Revenue** | 2020 | 2019 | 2020 | 2019 |
| Largest customer [Aetna] | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer | 13.6 | 15.2 | 15.1 | 20.1 |
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

***Ontrak Solutions' Inferior Services and False Billing Practices***

33.    As described in the Federal Securities Class Action, Ontrak solutions' services were contrary to the Company's claims that it could lower high healthcare costs for its members with behavioral health conditions.

34.    Ontrak's Director of Member Engagement Specialists Training during the Relevant Period (identified in the Federal Securities Class Action as FE4), explained that a list of

names was generated from Ontrak's customer health plans and then passed onto member engagement specialists. In order to qualify for an Ontrak referral, a member needed to have a chronic medical condition, a history of substance abuse or mental health problem, and generate at least $7,500 in health plan benefits. FE4 explained that the member engagement specialist would then call the names on the list informing the patients that new benefits were available to them, their insurer was being proactive as to their health, and then try to enroll them as an "Ontrak member."

35.    A former Ontrak member engagement specialist (identified in the Federal Securities Class Action as FE5) explained that, due to medical privacy rules, the list of contacts could not indicate what the patients' health problems were or what program would be suitable for them. Thus, it was the member engagement specialists' job to figure out what the patients needed by asking probing questions to see if they could help.

36.    If there was interest in becoming an Ontrak member, the person was referred to a "care coach," typically a nurse or certified health coach, who helped create a plan. FE4 explained that, after the plan was created, the member was then referred to a "clinical operations coordinator" who arranged for appointments with psychiatrists, dieticians, counselors, or other in-network specialists.

37.    Ontrak members were not allowed to schedule appointments with these specialists on their own. A former Ontrak Director of Quality and Organizational Performance from February 2017 to December 2020 (identified in the Federal Securities Class Action as FE1) explained that the Ontrak program typically lasted 52 weeks.

38.    According to FE4, Aetna provided Ontrak with its largest source of members, making up more than 85% of Ontrak's outreach pool. FE4 also noted that Aetna paid Ontrak

$750 for each member that enrolled in the program, and also provided the member engagement specialists with call scripts to use when reaching out to Aetna members.

39.    A former Ontrak quality assurance analyst from August 2017 to March 2021 (identified in the Federal Securities Class Action as FE6) explained that Ontrak's billing practices included Aetna being billed anytime an Ontrak member interacted with a care coach. Further, monthly check-ins were a common occurrence. Another former member engagement specialist (identified in the Federal Securities Class Action as FE7) disclosed that Ontrak often billed enrolled members that they knew would later be deemed ineligible for services not covered under their health insurance plan. This allowed Ontrak to continue charging Aetna for an additional three months of covered care coach check-ins, knowing full well that the member would eventually have to be unenrolled.

40.    Eventually, Ontrak put together a data algorithm team to identify why so many Aetna members were being deemed ineligible for future Ontrak services. An Ontrak member specialist appointed to the team (identified in the Federal Securities Class Action as FE8) stated that it occurred so often because Aetna Medicare plans did not cover mental health treatment. FE8 explained that Ontrak knowingly billed Aetna for these uncovered mental health treatments because Aetna would sometimes pay Ontrak after it submitted its first bill. As a result of these continued payments, Ontrak's management had no incentive to resolve this issue.

41.    By May 2020, a former Ontrak design researcher and strategist (identified in the Federal Securities Class Action as FE3) stated that Aetna was beginning to question Ontrak's value to them. Thus, in May 2020 Aetna stopped providing Ontrak with the data necessary for the member engagement specialists to generate new potential contacts. FE5 confirmed that, by September 2020, he had stopped receiving new patients to contact and was instead asked to re-

engage with the same members over and over again.

42.     As a result, Aetna and the Company had conference calls every Friday to discuss ongoing issues. A direct participant in these calls was a former Director of Operations at Ontrak (identified in the Federal Securities Class Action as FE2), who noted that Dr. Bill Gillis, Aetna's Clinical Director of Behavioral Health Operations and Program Design, was suspicious of Ontrak's billing practices. Specifically, Aetna objected to being continually billed for months when there were no services provided. Ontrak contended that members were still talking to care coaches but, after Aetna requested records of these meetings, it was determined that some of the care coach meetings never occurred – even though Aetna was still being billed for them. In addition, FE2 stated that this issue was brought up well before Aetna requested a CAP from Ontrak in July 2020.

43.     FE1, FE2, and FE3 confirmed that Aetna transmitted a CAP to Ontrak in July 2020, to be completed within 60 days, seeking information about the benefits of using Ontrak's services. Specifically, Aetna wanted clarity as to the Company's billing practices; specifically, evidence that care coaches were influencing members to actually see therapists and that Ontrak was using proper business practices to enroll new members. Aetna also wanted a refund for payments made for the enrollment of Ontrak members who never actually received any services. FE1 and FE2 believed that Ontrak's relationship with Aetna was coming to an end, especially after the CAP was transmitted.

44.     In July 2020, FE1 participated in three days of Zoom meetings with Ontrak executives, including Defendant Medeiros. FE1 recalled that none of the executives considered the CAP a serious issue and thus did little to address it. Specifically, Ontrak's Vice President of Sales and Strategic Partnerships, Charles Polatsek, assured employees that Aetna was only trying

to scare them and would not really take any action.

45.    According to FE1, Ontrak only responded to some of the CAP questions and, after sending back the incomplete responses, there was no acknowledgement from Aetna for three months.

46.    In the summer of 2020, FE7 recalled that Ontrak employees began seeing job postings for member engagement specialists that were posted by Aetna. After noticing these postings on several employment websites, Ontrak member engagement specialists became concerned that Aetna was terminating their relationship and replacing Ontrak solutions with an in-house department.

47.    This would be damaging to the Company since Aetna was a big contributor to Ontrak's business and accounted for 63.9% of the Company's revenue for the third quarter of 2020. As a result, during a Company Zoom meeting open to all employees, senior management was asked if employees' job were at risk. Ontrak management never answered the question.

48.    FE3 stated that she became concerned that Aetna would not renew its contract, especially because, as of the close of 2020, Ontrak had still not completed Aetna's CAP. FE7 also recalled Defendant Peizer commenting during a Zoom call that he would "pray" for Aetna to renew its contract.

49.    FE6 stated that, in January or February 2021, Defendant Peizer emailed all Ontrak employees notifying them that Aetna would not be renewing its contract. During a follow-up meeting, Defendant Peizer told Ontrak employees that the Company would recover from this and there were no plans to lay anyone off.

**The Individual Defendants' False and Misleading Statements**

***August 5, 2020 Press Release, Form 10-Q, and Earnings Call***

50.    Ontrak filed a Form 8-K with an attached press release on August 5, 2020

announcing its second quarter 2020 financial results. In the press release, Defendant Peizer stated

that during the second quarter, Ontrak "grew [its] pipeline of potential new customers to its most

robust level in the company's history."

51.    Also on August 5, 2020, the Company filed a quarterly report on Form 10-Q with

the SEC for the period ended June 30, 2020 (the "2Q 2020 10-Q"). However, Ontrak did not

disclose Aetna's request for a CAP from the Company in July or any other issues it was having

with its largest customer. Defendants Peizer and LaVerne signed the 2Q 2020 10-Q. Defendants

Peizer and LaVerne also certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the

2Q 2020 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities

Exchange Act of 1934" and that the information contained in the 2Q 2020 10-Q "fairly presents,

in all material respects, the financial condition and results of operations of Ontrak."

52.    That same day, the Company held a conference call to discuss its second quarter

2020 results. Defendant Peizer suggested on the call that Ontrak's business relationship with

Aetna was growing, stating, in relevant part:

> Whether it is further expansions with Aetna and other existing customers, the
> impending launch of our signed Cigna expansions, enhancements to our
> algorithms feeding the outreach pool or potential new logos and pilots, I'm really
> excited to see the hard work, dedication, passion and grit of every Ontrak
> teammate as we proceed onto new heights.

53.    Additionally, an analyst asked about enrollment rates and Defendant Peizer

responded that "the enrollment rate is based on the outreach pool" and that the Company is

"adding new members all the time."

54.    The statements made in the August 2020 press release, the 2Q 2020 10-Q, and the

August 5, 2020 conference call were false and misleading for several reasons. In May 2020,

months before the press release was issued, Aetna ceased to provide Ontrak with the data

necessary to obtain new members and therefore knew it was not going to be at "its most robust level in the company's history." Further, Ontrak's billing practices were called into question, which triggered Aetna to transmit a CAP to the Company, challenging the benefits of its services to Aetna. Ontrak knowingly failed to address the CAP thereby jeopardizing its relationship with its largest customer. This constituted a material risk to the Company, which warranted disclosure in the 2Q 2020 10-Q, specifically because Aetna generated over half of Ontrak's revenue.

55.    Additionally, Defendant Peizer's statements on the conference call were misleading when he indicated that business with Aetna was expected to achieve "new heights." He failed to disclose to investors that Aetna had turned off its data feed of records to Ontrak in May, and that the Company failed to complete the CAP sent by Aetna. Further, by touting "enhancements to our algorithms feeding the outreach pool," Defendant Peizer materially misled investors about Ontrak's current state of business affairs by failing to disclose that Aetna made up more than 85% of Ontrak's outreach pool, and that it had actually stopped providing any new customer lists to Ontrak.

56.    These false and misleading statements and omissions artificially inflated the value of the Company's stock. On August 26, 2020, the Company closed a preferred stock offering with aggregate gross proceeds of $48.9 million, after accounting for the full exercise of the underwriters' overallotment option, which closed on September 8, 2020.

***November 5, 2020 Press Release***

57.    On November 5, 2020, Ontrak filed a Form 8-K with an attached press release announcing its third quarter 2020 financial results. The press release quoted Defendant Peizer:

> New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, ***despite the customer having no compliance issues or concerns with Ontrak***.

***

> Ontrak's rapid engagement and enrollment of the members of one of our largest
> plan partners exceeded estimated rates to such an extent that they asked us to
> reschedule further enrollment to 2021 to allow their budget to catch up.

(Emphasis added.)

58.    The press release also highlighted that revenue for the third quarter had grown
172% year-over-year, 39% quarter-over-quarter, and that "[r]evenue [g]rowth in 2021 [is]
expected [to be] in excess of 100%[.]"

59.    Defendant Peizer's statements that the Company's largest client, Aetna, was
merely conducting compliance reviews of its vendors materially misled investors as to the actual
reason why Aetna was turning off the data feed of new potential members to Ontrak. In fact,
Aetna's compliance issues and concerns were solely directed at Ontrak and questioned the
benefit of its services and the legitimacy of its billing practices. Moreover, Aetna had actually
turned off its data feed to Ontrak in May, not July.

60.    In July 2020, Aetna transmitted a CAP with the expectation that Ontrak would
substantively answer Aetna's questions and implement the plan. However, the Company had no
intention to do so, which in turn jeopardized negotiations to renew Aetna's contract.
Additionally, projecting revenue growth of 100% and anticipating "continued significant
expansion" was materially false because Aetna was questioning Ontrak's billing practices and its
added value. The Individual Defendants also knew or should have known that the contract with
its largest customer was at risk of being terminated.

***November 5, 2020 Conference Call***

61.    Also on November 5, 2020, the Company held a conference call to discuss its
third quarter 2020 results, hosted by Defendants Peizer, LaVerne, and Medeiros. After telling
analysts that Ontrak expected revenue growth in excess of 100%, Defendant Peizer discussed the

reason for Aetna's compliance review of the Company, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak***...Importantly, this is one of the plans for which we anticipate continued significant expansion.***

(Emphasis added.)

62.     Defendant Peizer also stated on the call that Aetna typically provided data "on a monthly refresh," however by November, no new data had been provided in five months. Thus, it was false and misleading to suggest that enrollment was going so well and that "one of [Ontrak's] largest plan partners" was progressing so quickly that they needed to stop enrolling new members.

63.     Defendant Medeiros responded to a question from Charles Rhyee of Cowen and Company, LLC regarding when the issue with Aetna would be resolved:

> So as far as timing with the expected data refreshes to be turned back on, we have a mutual agreement with the client based on our current understanding that ***we expect the data to be turned back on by the end of the year.***

(Emphasis added.)

64.     Defendant Medeiros also stated that "with Aetna, we have scheduled multiple geography expansions that we hope to sign in the fourth quarter and roll out early in the year."

65.     Defendant Peizer referred to a potential expansion with Aetna for servicing members with depression and anxiety. Defendant Peizer noted that although no specific plans for expansion were currently in place, "I would be surprised, and ***we would all personally be surprised and disappointed, if the expansions that we are alluding to don't happen in 2021.***" (Emphasis added.)

66.     Defendant Peizer repeatedly stated on the call that the Aetna "data refresh" was

not a performance issue. In response to a question from Richard Collamer Close of Cannacord Genuity Corp. regarding a lower guidance due to the "Aetna data issue," Defendant Peizer stated that "***it really has nothing to do with us.*** In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is." (Emphasis added.)

67.    Further, Defendant Medeiros statement that Ontrak had a "mutual agreement" with Aetna to have the data feed turned on by the end of the year.

68.    Defendants Peizer stated that the compliance checks from its largest customer were routine and not specifically directed at the Company. However, since May 2020 Aetna expressed that it had specific compliance issues and concerns as to Ontrak's billing practices, and whether it provided a return on Aetna's investment. It was false and misleading for Defendants Peizer and Medeiros to suggest that Ontrak was confident of future plans to expand into new geographies and patient groups with Aetna. In reality, Ontrak had no intention of addressing the concerns raised in the CAP and was therefore unlikely to receive any new business from Aetna.

69.    The data feed Defendant Medeiros referenced had been turned off since May due to suspicions of improper billing practices by Aetna, and a CAP was later transmitted to Ontrak to address these concerns. Given the fact that by November the Company had not submitted complete responses to Aetna's CAP, it was unlikely that the data feed would be turned "back on" or that Aetna would renew their contract with Ontrak.

***November 5, 2020 10-Q***

70.    Also on November 5, 2020, the Individual Defendants caused Ontrak to file a Form 10-Q with the SEC for the period ended September 30, 2020 (the "3Q 2020 10-Q"), affirming the previously reported financial results. The 3Q 2020 10-Q was signed by Defendants

16

Peizer and LaVerne. Additionally, Defendants Peizer and LaVerne signed SOX certifications representing, among other things, that the 3Q 2020 10-Q "fairly presents, in all material respects, the financial condition and results of operations of Ontrak."

71.     The 3Q 2020 10-Q contained the following table showing the "concentration of credit risk by customer revenue as a percentage of [Ontrak's] total revenue:"

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Largest customer | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer | 13.6 | 15.2 | 15.1 | 20.1 |
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

72.     In addition, the 3Q 2020 10-Q stated:

*A substantial percentage of our revenues are attributable to four large customers, any or all of which may terminate our services at any time.*

Four customers accounted for an aggregate of 95% and 85% of our total revenue for the three months ended September 30, 2020 and 2019, respectively, and four customers accounted for an aggregate of 85% and 83% of our revenue for the nine months ended September 30, 2020 and 2019, respectively. ***Also, four customers represented an aggregate of 100% and 89% of our total accounts receivable as of September 30, 2020 and December 31, 2019, respectively***. We expect that revenues from a limited number of customers will continue for the foreseeable future. Sales to these customers are made pursuant to agreements with flexible termination provisions, generally entitling the customer to terminate with or without cause on limited notice to us. ***We may not be able to keep our key customers, or these customers may decrease their enrollment levels***. Any substantial decrease or delay in revenues relating to one or more of our key customers would harm our financial results. If revenues relating to current key customers cease or are reduced, we may not obtain sufficient enrollments from other customers necessary to offset any such losses or reductions.

(Emphasis added.)

73.     Moreover, the 3Q 2020 10-Q stated that:

***Our programs may not be as effective as we believe them to be, which could
limit our potential revenue growth***.

Our belief in the efficacy of our Ontrak solution is based on a limited experience
with a relatively small number of patients. Such results may not be statistically
significant, have not been subjected to close scientific scrutiny, and may not be
indicative of the long-term future performance of treatment with our programs. If
the initially indicated results cannot be successfully replicated or maintained over
time, utilization of our programs could decline substantially. There are no
standardized methods for measuring efficacy of programs such as ours. ***Even if
we believe our solutions are effective, our customers could determine they are
not effective by utilizing different outcome measures***. In addition, even if our
customers determine our solutions are effective they may discontinue them
because they determine that the aggregate cost savings are not sufficient or that
our programs do not have a high enough return on investment. Our success is
dependent on our ability to enroll third-party payor members in our Ontrak
solutions. Large scale outreach and enrollment efforts have not been conducted
and only for limited time periods and we may not be able to achieve the
anticipated enrollment rates.

(Emphasis added.)

74.     The statements and omissions in the 3Q 2020 10-Q were false and misleading

because the 3Q 2020 10-Q omitted any reference to Aetna's CAP or the Company's response to

it. The Company stated that a substantial percentage of its revenues were attributable to four

large customers. However, there was no mention that Ontrak's largest customer, Aetna, had

expressed concern as to the Company's efficacy and billing practices, or that Aetna was

reasonably likely to terminate its contract with the Company. The 3Q 2020 10-Q contained

generic risk warnings about the possibility of losing business from its largest customer, but it

failed to mention that such a loss would have an outsized impact on Ontrak's financial results,

thereby making it unlikely for the Company to achieve revenue growth of 100% during fiscal

2021.

75.     Ultimately, the Individual Defendants succeeded in keeping the stock price

artificially inflated, in part because they continued to mislead analysts who, in turn, unknowingly

presented false and misleading information to investors. For example, in its November 5, 2020

analyst report, Cannacord Genuity Corp. explained that Aetna was not sharing potential new customer data with Ontrak because "CVS required all 3rd party vendors, including those for Aetna, to be reviewed for compliance requirements," and that despite this issue, Ontrak "continued to execute."

76.     Similarly, in its November 5, 2020 analyst report, Cowen and Company ("Cowen") wrote that it remained positive on Ontrak and highlighted its growing enrollment despite "a data feed issue from [Aetna]." On November 25, 2020, Cowen published a report entitled "Takeaways from Investor Meetings with Management," discussing information from recent meetings with Ontrak. Cowen reported that Ontrak's management "expects the data feed issue with [Aetna] to be resolved in Dec.," and that management planned an "**expansion** with [Aetna] (already in late stages)." (Emphasis added.)

77.     The Individual Defendants' false and misleading statements artificially inflated the price of Ontrak securities. On December 21, 2020, Ontrak closed another offering of preferred stock, raising gross proceeds of approximately $42.8 million. Ontrak explained in its 3Q 2020 10-Q that its cash was primarily raised through offering Series A Preferred Stock. This offering, as well as the August 2020 preferred stock offering, establish the Individual Defendants' motive to conceal the Company's problems with Aetna to sell preferred stock at artificially inflated prices.

**The Truth Begins to Emerge**

***March 1, 2021 Form 8-K***

78.     Ontrak filed a Form 8-K with an attached press release on March 1, 2021, announcing the Company's preliminary financial results for the fourth quarter and full fiscal year ended December 31, 2020. The press release stated that the Company's largest customer had

terminated its contract with Ontrak, effective June 26, 2021. The Company's press release

quoted Defendant Piezer:

> After a long process with our largest customer where we believed we were working towards an extended and expanded contract, ***we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021. We were advised to stop enrollment of new members for this customer and await guidance from the customer on transition plans for the 8,400 members who are currently benefiting from the Ontrak program.*** We remain fully committed to the health plan and to its members, and will ensure that every member receives quality care through the transition, so that pandemic-related anxiety is not heightened by the change in the member's care team.
>
> ***The relationship with our Ontrak-A customer was unique, because they evaluated Ontrak on a provider basis, not as a vendor as do all of our other health plan partners. As such, the customer evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings, which were meaningful and significant***. Unlike our other health plan partners, we interacted only with the behavioral health division, with no involvement from the medical division of the plan. ***We believe that the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics***. We have consistently found that our care coaches have a tremendously positive impact on member experience and readiness to engage with the healthcare system. This is the reason that many digital healthcare apps are now building care coaching into their products. We have a strategy in place to regain the Ontrak-A business and are currently in late stage discussions with other customers whose metrics align with our value proposition of an integrated approach to whole health that delivers an average ROI of 3.7, average cost savings of 40% to 50%, and durable clinical outcomes with exceptionally high program retention and member experience scores. Collectively, we have a market opportunity of over $30 billion.

(Emphasis added).

79.    The press release highlighted the Company's enrolled members:

**Fourth Quarter 2020 and Recent Operating Highlights**:

- Total enrolled members increased to 15,702 at the end of Q4 2020 and stands at 15,822 as of today.

- Effective Outreach Pool of approximately 152,000 at the end of Q4 2020.

- Gross enrollment for the two-month period ended February 28, 2021, excluding the Ontrak-A customer, was 2,683, reflecting a 60% annualized enrollment rate.

80.    The press release further indicated that the Company no longer expected 100% revenue growth for fiscal 2021. It provided the following outlook, highlighting the impact of the loss of the customer:

> **For the year ending December 31, 2021, the Company provides the following outlook:**
>
> - Revenue of $100 Million. ***Initially, we were going to guide to 100% growth with revenues of $165 million. In light of Ontrak- A, we hopefully are being conservative with our $100 million revenue guidance.*** Of that number, approximately $88 million is either already under contract or in the signature phase and those health plan partners are already contemplating further expansions. Moreover, we see tremendous upside with large plans in our pipeline.
>
> - Given the strength of our pipeline, we anticipate returning to a 100% revenue growth rate in 2022.

(Italicized emphasis added.)

81.    On this news, the Company's share price declined by approximately 46%, or $27.32, to close at $31.62 per share on March 1, 2021.

82.    Although the stock had dropped significantly, the Individual Defendants continued to materially mislead investors and thus, continued to artificially inflate the stock price. Defendant Peizer's statement that Ontrak management was "notified after market close on February 26, 2021" was false and misleading as former Ontrak employees stated that this news was disclosed internally in early February. Further, Defendant Peizer's explanation that Aetna's decision to terminate the contract was "based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings" was also materially false and misleading. Aetna terminated its contract with the Company because Ontrak

failed to materially complete a CAP sent in July that required answers to suspicions of improper billing practices (billing members for services that they were not eligible for and billing for care coach visits that never occurred), providing evidence that care coaches visits led to members seeing therapists; and providing evidence as to the benefits of using Ontrak's services.

83.    In a conference call held later that same day attended by Defendants LaVerne and Medeiros, Defendant Medeiros made additional false and misleading statements as to the events resulting in Aetna terminating its contract. Specifically, he told analysts:

> In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time.

***

> [W]hen I received the call late Friday that talked about the termination, **it was a surprise**. We were working towards a new agreement and an expanded relationship.

(Emphasis added).

84.    The first statement effectively told investors that in December, Aetna's general audit of its vendors caused the data feed to Ontrak to be shut down. However, the feed was shut off in May 2020 due to specific problems Aetna was having with Ontrak's business practices. In fact, in July 2020 Aetna transmitted a CAP to Ontrak. Further, Defendant Medeiros' statement that he was surprised that Aetna did not renew its contract was false. As alleged in the Federal Securities Class Action, former Ontrak employees FE6 and FE9 stated that this news had been circulated by Defendant Peizer internally via email and a follow-up Zoom meeting in late January or early February.

**March 9, 2021 Conference Call**

85.    On March 9, 2021, Defendants Peizer, LaVerne, and Medeiros participated in a

conference call to discuss the financial results for fourth quarter and full year ended December 31, 2020. On this call, Defendant Peizer stated that "[t]he most significant headwind is the Aetna contract termination in June" and that Ontrak "will continue to graduate and disenroll members through the end of June."

86.     Defendant Peizer further stated on the call that:

[B]ecause we're classified as a provider, ***we were seen as an expensive provider*** because where our program might seem expensive. But as I pointed out earlier, we're really the lowest cost provider because our savings is so much greater than the actual cost of the program. So like all of our – as I mentioned last week and today, we work with the medical side on all of our health plans.

That's what distinguishes this from – Aetna from the others in our relationship. So we're going to endeavor to engage those that this matters. And believe me, there are people at Aetna and there are people at CVS who bought Aetna that care about the whole health and integrated care of these membership populations.

(Emphasis added.)

87.     Defendant LaVerne provided more details about the Aetna contract and the impact of its loss on the Company, stating:

In light of the pending termination of the Aetna contract in June, I wanted to provide some information that may help with understanding the business going forward. ***In 2020, Aetna represented 58% of total revenue. At the end of 2020, they represented approximately 82% of the outreach pool and 61% of members.***

***During the fourth quarter, the revenue was also 58% of total revenue, yet represented 66% of the average member count.***

What this demonstrates is that our average revenue per member during the quarter was less for this customer than the remainder of the business.

As I said before, the revenue per member for all of 2020 was $7,200. Yet excluding Aetna members, it was nearly $9,500. While ***the outreach pool will be significantly impacted by the loss of this customer***, the remaining outreach pool should have a significantly increased enrollment rate.

(Emphasis added.)

***March 16, 2021 Form 8-K and April 8, 2021 Form 8-K***

23

88.     On March 16, 2021, the Company filed a Form 8-K with an attached press release announcing that Defendant Peizer was stepping down as CEO and transitioning to Executive Chairman and Chairman of the Board. Then, on April 8, 2021, the Company announced in a Form 8-K that Defendant Medeiros was resigning, effective April 12, 2021.

***May 6, 2021 Form 8-K***

89.     On May 6, 2021, Ontrak filed a Form 8-K with an attached press release announcing its first quarter financial results and full year 2021 outlook, which addressed the decline in members, employees, and revenue outlook, stating:

**First Quarter 2021 and Recent Operating Highlights:**

- Total enrolled members numbered 14,868 at the end of Q1 2021 and decreased to 12,376 as of the date of this release. The transitional disenrollment of members in our Ontrak-A program began in April, and we expect to disenroll the remaining 4,160 Ontrak-A members by the end of June.

- The Company initiated a reduction in workforce as a result of the termination notice from Ontrak-A. The workforce reduction plan, which was designed to effectively align our resources, manage our operating costs, and address the change in staffing needs in the short term, affected approximately 35% of full time positions. We incurred $1.0 million in the current period and estimate $0.3 million to be incurred in the second quarter, with the plan expected to reduce annual compensation expense by approximately $17 million, primarily in cost of revenue.

*** *** ***

**For the year ending December 31, 2021, the Company provides the following outlook:**

- Given the arrival of Jonathan Mayhew as our CEO, we feel it would be appropriate to revise our guidance to revenue of $80-85 million, reflecting current expectations with our existing health plan customers regarding outreach pool, budget considerations and timing of expansions.

90.     The Individual Defendants caused the Company to issue materially false and misleading statements regarding the Company's business, operations, and prospects.

Specifically, the Individual Defendants failed to disclose that: (1) the Company was being evaluated on how it executed on a CAP sent by Aetna, though the Company had no plans to meaningful address this CAP; (2) due to this evaluation, Aetna was not likely to find Ontrak to be effective and was therefore likely to not renew its contract with Ontrak; (3) the loss of Aetna would significantly harm the Company; (4) therefore, Ontrak could not achieve its projected revenue guidance for the 2021 fiscal year; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Ontrak's public statements were materially false and misleading at all relevant times.

## **FIDUCIARY DUTIES**

91.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed, and continues to owe, Ontrak and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Ontrak in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Ontrak and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

92.     Each Individual Defendant owed and continues to owe Ontrak, and its stockholders, the fiduciary duties to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

93.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ontrak, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Ontrak, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a

publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

94.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

>       (a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;
>
>       (b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;
>
>       (c)     remain informed as to how Ontrak conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and
>
>       (d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Ethics and Business Conduct**

95.     The Individual Defendants, as officers and/or directors of Ontrak, were bound by the Company's Code of Ethics and Business Conduct[1] (the "Code of Conduct") which required the following:

Ontrak, Inc. ("Ontrak" or the "Company") has adopted this Code of Ethics and

---

[1] *See* Ontrak Code of Conduct: Ontrak-Code-of-Ethics-and-Business-Conduct_May-2021.pdf (ontrakhealth.com).

Business Conduct (this "Code") and to all activities relating thereto by the Company's stockholders, directors, officers, and employees (together the "Covered Persons").

\*\*\*

All of Ontrak's business records must be accurate and truthful, with no material omissions; the assets and liabilities of Ontrak must be accounted for properly in compliance with all tax and financial reporting requirements; and no false records are ever to be made. Similarly, all records that are submitted to government agencies, insurance carriers, health plans or other entities will be accurately and honestly made.

\*\*\*

All directors, officers, and employees should support the Company's goal to have full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Although most employees hold positions that are far removed from the Company's required filings with the SEC, each director, officer, and employee should promptly bring to the attention of the Chief Executive Office (the "CEO"), the Chief Financial Officer (the "CFO"), or the Audit Committee, as appropriate in the circumstances, any of the following:

Any material information to which such individual may become aware that affects the disclosures made by the Company in its public filings or would otherwise assist the CEO, the CFO, and the Audit Committee in fulfilling their responsibilities with respect to such public filings.

\*\*\*

1) The CEO and all senior financial officers are responsible for full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Audit Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Audit Committee in fulfilling their responsibilities.

2) The CEO and each senior financial officer shall promptly bring to the attention of the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data, (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting,

disclosures, or internal controls, or (c) any attempt to improperly influence, coerce or mislead the Company's independent auditors in violation of Section 303(a) of the Sarbanes-Oxley Act of 2002 and the rules of the SEC passed thereunder.

3) The CEO and each senior financial officer shall promptly bring to the attention of the Audit Committee any information he or she may have concerning any violation of this Code or the Company's Code of Business Conduct and Ethics, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

4) The CEO and each senior financial officer shall promptly bring to the attention of the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.

5) The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Business Conduct and Ethics or of these additional procedures by the CEO and the Company's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Business Conduct and Ethics and to these additional procedures, and may include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board), and termination of the individual's employment. In determining the appropriate action in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action, and whether or not the individual in question had committed other violations in the past.

6) The CEO and each senior financial officer shall keep written records or receipts of their individual disbursements made on behalf of the Company and for which they expect reimbursement by the Company. They shall deliver these evidences of their disbursements to the appropriate personnel in the accounting department of the Company.

96.     The Individual Defendants failed to adhere to the Code of Conduct when they

failed to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. Additionally, the Individual Defendants failed to maintain accurate records and disclose material information concerning the Company's operations.

97.    In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to Ontrak under the Audit Committee Charter (the "Audit Charter").[2] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

> The basic responsibility of the members of the Committee is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders. In discharging that obligation, members should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside auditors, attorneys and advisors, to the fullest extent permitted by applicable law.

> Pursuant to Article 5 of the Amended and Restated Bylaws of the Company, the Committee shall have and may exercise all the powers and authority of the Board in all matters required, necessary or reasonable in the performance of the Committee purpose, responsibility and functions described in this Charter.

> ***

> The Committee shall oversee the integrity of the audit process, financial reporting and internal accounting controls of the Company, oversee the work of the Company's management, internal auditors and the Auditors in these areas, oversee management's development of, and adherence to, a sound system of internal accounting and financial controls, review whether the internal auditors and the Auditors objectively assess the Company's financial reporting, accounting practices and internal controls, and provide an open avenue of communication among the Auditors, the internal auditors and the Board.

> ***

> In performing its functions, the Committee shall undertake those tasks and responsibilities that, in its judgment, would contribute most effectively to and implement the purposes of the Committee. In addition to the general tasks and responsibilities noted above, the specific functions of the Committee may include

[2] *See* Ontrak Audit Charter at: OnTrak_AuditCommitteeCharter_2020.pdf (ontrakhealth.com).

the following:

1. Review and discuss with management, and to the extent the Committee deems necessary or appropriate, the internal auditors, outside counsel or the Auditors, the Company's disclosure controls and procedures that are designed to ensure that the reports the Company files with the SEC comply with the SEC's rules and forms.

*** 

3. Review and discuss with management, the internal auditors and the Auditors the Company's quarterly financial statements, including disclosures made in management's discussion and analysis and the matters required to be discussed by AS No. 1301, prior to the filing of its Form 10-Q, including the results of the Auditors' reviews of the quarterly financial statements.

98.    The Audit Committee Defendants failed to uphold their duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding quarterly financial statements, compliance with laws and regulations, and system of internal controls.

## BREACHES OF DUTIES

99.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Ontrak, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

100.    The Individual Defendants breached their duties of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding Ontrak as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Ontrak substantial damage.

101.    The Audit Committee Defendants had a duty to review the Company's earnings

press releases and regulatory filings. The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Ontrak's public statements and internal control function.

102.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Ontrak, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Ontrak has expended, and will continue to expend, significant sums of money.

## DAMAGES TO ONTRAK

103.    The materially false and misleading statements described herein have exposed the Company to myriad reputational and financial damages, including but not limited to:

(a)    Possible restatements and goodwill impairments;

(b)    Liability arising from the Federal Securities Class Action;

(c)    The loss of credibility with customers and suppliers; and

(d)    Legal costs associated with litigation, investigations, and potential restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

104.    Plaintiff brings this action derivatively and for the benefit of Ontrak to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ontrak, waste of corporate assets, unjust enrichment, and violations of Section 20(a) of the Exchange Act.

105.     Ontrak is named solely as a nominal party in this action. This is not a collusive
action to confer jurisdiction on this Court that it would not otherwise have.

106.     Plaintiff is, and has been continuously, a stockholder of Ontrak. Plaintiff will
adequately and fairly represent the interests of Ontrak in enforcing and prosecuting its rights,
and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce
and prosecute this action.

107.     Plaintiff incorporates by reference and re-alleges each allegation stated above as if
fully set forth herein.

108.     A pre-suit demand on the Board of Ontrak is futile and, therefore, excused. At the
time of filing this action, the Board consists of Individual Defendants Peizer, Berman, Giraldo,
Seloff, Sherman, Quinn, Rebak, and Zecchini (the "Director Defendants"). Plaintiff needs only
to allege demand futility as to half (four) of the directors who are on the Board at the time this
action is commenced.

109.     Demand is excused as to all of the Director Defendants because each one of them
faces, individually and collectively, a substantial likelihood of liability as a result of the scheme
in which they engaged, knowingly or recklessly, to make and/or cause the Company to make
false and misleading statements and omissions of material facts, which renders them unable to
impartially investigate the charges and decide whether to pursue action against themselves and
the other perpetrators of the scheme.

110.     In complete abdication of their fiduciary duties, the Director Defendants either
knowingly or recklessly participated in making and/or causing the Company to make the
materially false and misleading statements alleged herein. The fraudulent scheme was intended
to make the Company appear more profitable and attractive to investors. As a result of the

foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

111.    Demand on Defendant **Peizer** is futile because he has served as a Company director since 2003. He has received and continues to receive compensation for his roles as Executive Chairman and Chairman of the Board. Defendant Peizer signed and thus personally made the false and misleading statements in the 2Q 2020 10-Q and the 3Q 2020 10-Q. He is a named defendant in the Federal Securities Class Action and made the materially false and misleading statements in the August 5, 2020 press release; the November 5, 2020 press release; the August 5, 2020 conference call; and the November 5, 2020 conference call. For these reasons, Defendant Peizer breached his fiduciary duties and faces a substantial likelihood of liability, and thus demand upon him is futile and, therefore, excused. Furthermore, Form DEF 14A filed June 30, 2021 admits that Defendant Peizer is not independent. He serves on the board of directors with Defendant Sherman at BioVie, Inc. ("BioVie"). As such, Defendant Peizer lacks independence from Defendant Sherman. For these reasons, Defendant Peizer is not independent or disinterested, and thus demand upon him is futile and, therefore excused.

112.    Demand on Defendant **Berman** is futile because he has served as a Company director since 2014. He has received and continues to receive compensation for his role as a director as described herein and is Chair of the Audit Committee, and thus failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Berman breached his fiduciary duties and faces a substantial likelihood of liability.

113.    Additionally, Defendant Berman lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the

majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Berman that allowed him to breach his fiduciary duties and will continue to influence Defendant Berman regarding the claims described herein that would be the subject of a litigation demand. Furthermore, Defendant Berman serves on the board of directors with Defendant Peizer at Verde, Inc. At Verde, Inc. Defendant Peizer is the Executive Chairman of the Board. As such, Defendant Berman is subject to Defendant Peizer's coercive influence. For these reasons, Defendant Berman is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114.    Demand on Defendant **Giraldo** is futile because he has served as a Company director since November 2019. He has received and continues to receive compensation for his role as a director as described herein and is a member of the Audit Committee, and thus failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Giraldo breached his fiduciary duties and faces a substantial likelihood of liability. Additionally, Defendant Giraldo lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Girlado that allowed him to breach his fiduciary duties and will continue to influence Defendant Giraldo regarding the claims described herein that would be the subject of a litigation demand. For these reasons, Defendant Giraldo is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Demand on Defendant **Seloff** is futile because she has served as a Company director since October 2018. She has received and continues to receive compensation for her role as a director as described herein and is a member of the Audit Committee, and thus failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Seloff breached her fiduciary duties and faces a substantial likelihood of liability. Additionally, Defendant Seloff lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Seloff that allowed him to breach his fiduciary duties and will continue to influence Defendant Seloff regarding the claims described herein that would be the subject of a litigation demand. For these reasons, Defendant Seloff is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

116.    Demand on Defendant **Sherman** is futile because he has served as a Company director since July 2017. He has received and continues to receive compensation for his role as a director as described herein and failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Sherman breached his fiduciary duties and faces a substantial likelihood of liability.

117.    Additionally, Defendant Sherman lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman

and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Sherman that allowed him to breach his fiduciary duties and will continue to influence Defendant Sherman regarding the claims described herein that would be the subject of a litigation demand. Furthermore, Defendant Sherman is beholden to Defendant Peizer because Defendant Peizer is Chairman, CEO, and the controlling stockholder of BioVie. Defendant Sherman is also beholden to Defendant Peizer because they serve on the board together at Verde, Inc. At Verde, Inc., Defendant Peizer is the Executive Chairman of the Board. As such, Defendant Sherman is subject to Defendant Peizer's coercive influence. For these reasons, Defendant Sherman is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.     Demand on Defendant **Quinn** is futile because she has served as a Company director since August 2020. She has received and continues to receive compensation for her role as a director as described herein and failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Quinn breached her fiduciary duties and faces a substantial likelihood of liability. Additionally, Defendant Quinn lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Quinn that allowed him to breach his fiduciary duties and will continue to influence Defendant Quinn regarding the claims described herein that would be the subject of a litigation demand. For these reasons, Defendant Quinn, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

119.     Demand on Defendant **Rebak** is futile because he has served as a Company

director since July 2019. He has received and continues to receive compensation for his role as a director as described herein and failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Rebak breached his fiduciary duties and faces a substantial likelihood of liability. Additionally, Defendant Rebak lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Rebak that allowed him to breach his fiduciary duties and will continue to influence Defendant Rebak regarding the claims described herein that would be the subject of a litigation demand. For these reasons, Defendant Rebak, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Demand on Defendant **Zecchini** is futile because he has served as a Company director since October 2018. He has received and continues to receive compensation for his role as a director as described herein and failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Ontrak's SEC filings and other disclosures. For these reasons, Defendant Zecchini breached his fiduciary duties and faces a substantial likelihood of liability. Additionally, Defendant Zecchini lacks independence from Defendant Peizer who faces a substantial likelihood of liability, holds the largest share of voting stock, and was the majority holder of voting stock during the misconduct described herein. As Executive Chairman and Chairman of the Board, Defendant Peizer holds a coercive influence over Defendant Zecchini that allowed him to breach his fiduciary duties and will continue to influence Defendant Zecchini regarding the claims described herein that would

be the subject of a litigation demand. For these reasons, Defendant Zecchini, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    As trusted Company directors, the above directors conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

122.    Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

123.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 20(a) of the Exchange Act. In

further violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

124.    Ontrak has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ontrak any part of the damages Ontrak suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

125.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As half of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

126.    The acts complained of herein constitute violations of fiduciary duties owed by Ontrak's officers and directors, and these acts are incapable of ratification.

127.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least half of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

128.    Plaintiff repeats and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    The Individual Defendants, by virtue of their positions with Ontrak and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ontrak and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Ontrak to engage in the illegal conduct and practices complained of herein.

130.    Plaintiff, on behalf of Ontrak, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ontrak's business and affairs.

133.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

134.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ontrak.

135.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

136.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

137.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that Ontrak was on track for a "continued significant expansion" of its business with Aetna, yet failed to disclose that: (1) the Company was being evaluated on how it executed on a CAP sent by Aetna, though the Company had no plans to meaningful address this CAP; (2) due to this evaluation, Aetna was not likely to find Ontrak to be effective and was therefore likely to not renew its contract with Ontrak; (3) the loss of Aetna would significantly harm the Company; (4) therefore, Ontrak could not achieve its projected revenue guidance for the 2021 fiscal year; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Ontrak's public statements were materially false and misleading at all relevant times

138.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

139.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless

disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

140.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

141.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

142.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ontrak has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143.    Plaintiff, on behalf of Ontrak, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

144.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Ontrak.

146.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Ontrak tied to the performance or artificially inflated valuation of Ontrak, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

147.    Plaintiff, as a stockholder and a representative of Ontrak, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

148.    Plaintiff, on behalf of Ontrak, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Ontrak will lose financing from investors and business from future customers who no longer trust the Company and its products.

151.    Because of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

152.     Plaintiff, on behalf of Ontrak, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Ontrak, and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached their fiduciary duties to Ontrak;

C.     Determining and awarding to Ontrak the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.     Directing Ontrak and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Ontrak and its stockholders from a repeat of the damaging events described herein;

E.     Awarding Ontrak restitution from Individual Defendants;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

Dated: December 1, 2021                    Respectfully submitted,

                                          **BIELLI & KLAUDER, LLC.**

                                          */s/ Ryan M. Ernst*
                                          Ryan M. Ernst (#4788)
                                          1204 N. King St.
                                          Wilmington, DE 19801
                                          (302) 803-4600
                                          rernst@bk-legal.com

                                          **LEVI & KORSINSKY, LLP**
                                          Correy A. Kamin
                                          Ryan C. Messina
                                          55 Broadway, 10th Floor
                                          New York, NY 10006
                                          T. 212.363.7500
                                          F. 212.363.7171
                                          ckamin@zlk.com
                                          rmessina@zlk.com

                                          *Attorneys for Plaintiff Maxx Vega*